# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

Nos. 03-1582/03-1955

———————

David Reagan,                                            *
                                                        *
            Appellee/Cross-Appellant,                   *
                                                        *    Appeal from the United States
    v.                                                  *    District Court for the Eastern
                                                        *    District of Arkansas.
Larry Norris, Director, Arkansas                        *
Department of Corrections,                              *
                                                        *
            Appellant/Cross-Appellee.                   *

———————

Submitted: November 17, 2003

Filed: April 7, 2004

———————

Before LOKEN, Chief Judge, McMILLIAN, and BEAM, Circuit Judges.

———————

BEAM, Circuit Judge.

Larry Norris, as Director of the Arkansas Department of Corrections, appeals the district court's grant of one ground for relief in David Reagan's 28 U.S.C. § 2254 petition for habeas corpus. The district court determined that Reagan was denied conflict-free representation in violation of the Sixth Amendment. Reagan cross-appeals the district court's denial of his claim concerning an improper jury instruction. Since we reverse on the cross-appeal, we do not reach the Sixth Amendment claim.

## I.    BACKGROUND

Reagan was convicted in 1990 of first-degree murder in Arkansas state court for the death of two-year-old Sarah Binkard. Reagan and his girlfriend, Renay Binkard, lived together with Renay's four children in the fall of 1989. On November 27, 1989, Reagan and Renay took Renay's youngest daughter, Sarah, to the emergency room of a local hospital because she was having trouble breathing. The emergency room doctors found that her abdomen was swollen and bloated, she had several bruises on her body, cigarette burns on her feet, and other scars. Her diaper was bloody, and, at first, the doctors erroneously believed she had been sexually abused. Emergency room personnel could not revive Sarah, and she was pronounced dead approximately seventy-five minutes after arriving at the hospital.

Reagan was charged with first-degree murder, while Renay was originally charged with second-degree murder and permitting the abuse of a child. Renay's charge was later upgraded to first-degree murder, but prior to Reagan's trial she accepted the state's offer that she plead guilty to permitting the abuse of a child and receive a ten-year sentence, with four years suspended. The plea agreement was not finalized nor was the murder charge formally dropped until after Reagan's trial. Reagan and Renay were both represented by the same attorney–C.W. Knauts. While the murder cases were proceeding, Knauts was also appointed to represent Renay in a dispute with the state concerning the custody of her remaining three children.

At Reagan's trial, the medical examiner testified that although there was evidence that Sarah had been a victim of child abuse in the past, the immediate cause of her death was an infection from a ruptured bowel caused by a blow with a blunt object, likely a fist or an elbow, at least twenty-four hours before her death.

Police officers testified that Reagan told different stories regarding Sarah's injuries. Reagan first told the police that Sarah had fallen off of a four-foot-high

porch. In his second statement, Reagan stated that while raking leaves, he tripped over a limb and fell onto Sarah's stomach with his knee. In his third statement, Reagan told police that he was dislodging a large limb from a tree when he fell back onto Sarah, knocking her down.

There was conflicting testimony at trial about Reagan's treatment of Renay's children. Although some witnesses suggested that Reagan was possibly abusive, there was also testimony from several sources that the children loved Reagan and that he took care of them as though they were his own.

The prosecution did not call Renay (as the defense apparently thought it would, based on her plea bargain), and so the defense called her as a witness. On direct examination, Renay testified that she had seen Sarah fall off of the porch the day before she died, but that Reagan had not told her he had fallen on Sarah. Renay also testified that Reagan took good care of the children and that she did not think he had intentionally harmed Sarah. Renay testified that Sarah was anemic and would bruise very easily. She denied knowing anything about cigarette burns on Sarah, and explained that she had pled guilty to permitting abuse of a child because she felt some criminal responsibility for being too strict of a disciplinarian or for not looking after the children well enough.

On cross-examination, the government impeached Renay's direct testimony with evidence that she had told police on the night of Sarah's death that Reagan had likely abused Sarah, both the day before and during past incidents when Sarah suffered unexplained bruises. She explained that, at the time she gave these potentially damaging statements to the police, she mistakenly believed that Reagan had sexually molested Sarah. She further testified that Reagan smoked, while she did not (creating an inference about the burn marks on Sarah's feet). Knauts did not conduct a redirect examination of Renay following this testimony.

Reagan testified in his own defense that he had fallen into Sarah while tugging on a stray limb from a tree in the yard in the late afternoon. Sarah seemed to be okay at the time, so he took her inside and gave her a sandwich. After she had eaten it, they returned outside until dark while he worked on his car and the children played. The next day, after a morning of errands, Sarah took a nap shortly after lunch and remained asleep until Renay woke her up around 5:30 p.m. Renay called Reagan into Sarah's room because she was having trouble breathing, and the two decided to take her to the emergency room.

Reagan testified that he enjoyed taking care of the children and wanted to be a father to them. He acknowledged that Sarah had been bruised in the past by her brothers' roughhousing and by the dog knocking her off the stairs or porch, but he also noted that Sarah was anemic and bruised easily. Reagan testified that he did not give contradictory statements to the police regarding the limb, but that the investigator incorrectly recorded his second statement.

The case was submitted to the jury with the following first-degree murder instruction:

> David H. Reagan is charged with the offense of murder in the first degree. To sustain this charge the state must prove beyond a reasonable doubt that David H. Reagan caused the death of Sarah Binkard, date of birth, November 20, 1987, a person under the age of 14 years under circumstances manifesting cruel and malicious indifference to the value of human life.[1]

---

[1]In 1990, the relevant Arkansas statute defined first-degree murder as when a person "knowingly causes" the death of a child while manifesting cruel and malicious indifference. Ark. Code § 5-10-102(a)(3).

The judge instructed the jury that, for it to find circumstances manifesting cruel and malicious indifference to the value of human life, it must "find that by his actions [Reagan] caused the death of Sarah Binkard, a person under the age of fourteen years."

Reagan was convicted of first-degree murder and sentence to life in prison. This is the second time we have considered an appeal in Reagan's habeas corpus case. In our prior opinion, we recounted the case's lengthy procedural history, determined that Reagan had not procedurally defaulted his ineffective assistance of counsel claims, and remanded the case to the district court for further proceedings relating to those claims. Reagan v. Norris, 279 F.3d 651, 657-58, 660 (8th Cir. 2002) (Reagan I).

Following our remand in Reagan I, the district court held an evidentiary hearing. At the evidentiary hearing, Knauts testified that he was simultaneously appointed to represent both Renay and Reagan and that he realized there might be a conflict issue shortly after he began representing them, but did not think it was problematic enough to withdraw as counsel for either one. Knauts repeatedly stated that it was his strategy to keep Renay as a client to keep her from completely turning on Reagan. Knauts stated that she was "difficult" to work with and that he thought it would be best to keep her in their camp. Despite this, however, it is clear from the record that Knauts did not ever consider the possibility that Reagan's alleged fall onto Sarah did not cause her fatal injuries, but that Renay had inflicted them instead. Knauts believed that the first-degree murder charge against Renay was "overkill" and an attempt to get her to testify against Reagan.

Knauts knew about evidence in the record that Renay had been investigated for child abuse involving Sarah as early as December 1988, when Reagan was not living with her (but while they were dating). However, once Renay's positive direct testimony had been undermined by the state on cross-examination, Knauts

acknowledged that "we didn't ever make any plans to try to impeach" Renay's testimony further regarding the previous investigation into Sarah's abuse.

While the murder trials were pending, Knauts was also appointed to represent Renay in a dispute with the state regarding the custodial status of her remaining three children. Knauts admitted at the evidentiary hearing that it would have been harmful to Renay's custody case to show during Reagan's trial that she was an abusive mother. Finally, Knauts defended his decision not to ask Renay about her smoking marijuana (and thereby creating the inference that she had inflicted the burns on Sarah's feet) by stating that he did not want to inject the "drug" element into the case.

With regard to the second ineffective assistance claim, Knauts admitted at the evidentiary hearing that the word "knowingly" should have been included in the first-degree murder instruction. He stated that his failure to object was likely due to a lack of time to thoroughly review the instructions and that he did not have any strategic reason for not objecting to the instruction. Knauts agreed that even if the jury had believed Reagan's story about accidentally falling on Sarah, under the instructions given, he would still have been convicted of first-degree murder.

The district court granted relief on the conflict of interest claim and denied relief on the jury instruction issue. With regard to the conflict claim, the district court reasoned that Knauts's joint representation precluded him from redirecting Renay's testimony in an effort to control the damage done by the state on cross-examination or from exploring the possibility that Renay had inflicted the injures. And his representation of Renay in the state custody proceeding further undermined his vigorous defense of Reagan. The district court rejected Reagan's faulty jury instruction claim, finding that Reagan was not prejudiced by counsel's failure to object because the evidence of his guilt was compelling.

## II. DISCUSSION

Habeas corpus appeals are governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Pursuant to the AEDPA, we cannot grant habeas relief on any claim "adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

We first address the ineffective assistance issue as it relates to the jury instructions. Since this claim was not presented to the state appellate courts due to ineffective assistance of Reagan's direct appeal counsel, see Reagan I, 279 F.3d at 657-58, there is no state court adjudication of this claim, and we need not apply the AEDPA's deferential standard of review. Taylor v. Bowersox, 329 F.3d 963, 967-68 (8th Cir. 2003), cert. denied, 72 U.S.L.W. 3598 (U.S. Mar. 22, 2004) (No. 03-8525). We review the district court's factual determinations for clear error and its legal conclusions de novo. Id. at 968. See also Johnston v. Luebbers, 288 F.3d 1048, 1051 (8th Cir. 2002) ("Although AEDPA directs our review of state court decisions, we apply our usual standards of review to the decision of the District Court, reviewing factual findings for clear error and questions of law or mixed questions of law and fact de novo."), cert. denied, 537 U.S. 1166 (2003). To succeed on a Sixth Amendment ineffective assistance of counsel claim, Reagan must show that his attorney's representation fell below an objective standard of reasonableness, and that he was actually prejudiced, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

Here, trial counsel concedes that the first prong is not in dispute–his failure to object to a first-degree murder instruction without an essential element of the crime fell below an objective standard of reasonableness. He did not employ any particular trial strategy in failing to object to the defective instructions; he says he simply did not have time to adequately review the jury instructions. Nor does the state attempt to defend counsel under the performance prong of Strickland. See Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir. 1989) (finding that defense counsel's failure to object to jury instructions that misstated Illinois law was deficient performance under Strickland).

The only question, then, is whether Reagan was prejudiced by counsel's deficient performance. The state argues, and the direct court agreed, that because evidence of Reagan's guilt was compelling, he was not prejudiced by the errant instruction. The state further points out that, contrary to Reagan's argument, an instruction that omits an element of an offense is not structural error upon which reversal of a conviction is automatic, and cites Neder v. United States, 527 U.S. 1, 8-9 (1999) (holding that an instruction that omits an element of the offense does not *necessarily* render a trial fundamentally unfair).

We do not find the evidence so overwhelming that we can say that Reagan was not prejudiced. The jury could have believed every aspect of the defense's case and still convicted Reagan of first-degree murder because the jury was instructed that simply "causing" Sarah's death would constitute cruel and malicious indifference. Under this scenario, he was prejudiced, and the state's arguments to the contrary are unavailing. The presence of other marks and scratches on Sarah's body are not dispositive of Reagan's guilt under the evidence presented at trial. There was evidence that she was anemic, evidence of roughhousing by her three older brothers, testimony about the family dog knocking Sarah around, and about Sarah falling off of the porch the day before her death. While these incidents did not cause Sarah's

fatal injuries, they are evidence from which a reasonable jury could infer that Regan was not the source of other marks and bruises on the toddler's two-year-old body.

Nor do Reagan's differing statements to the police preclude relief. Reagan's first statement was about Sarah's fall off the porch steps, and Renay testified that this had happened. His remaining two statements, while somewhat different, both involve a tree limb and his accidental falling on Sarah. While testifying at trial, Reagan insisted that he did not give the investigator different statements, but instead that the investigator wrote them down incorrectly. If contradictory, these statements could be evidence of a culpable mental state, but they are not necessarily that contradictory. Moreover, under the instructions given, the jury was not even required to find the requisite mental state to convict Reagan.[2]

In light of this, we hold Reagan has established he was actually prejudiced by counsel's failure to object to the instructions and that the district court should have granted habeas relief on this claim. There is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. The jury could have believed that Reagan did not knowingly cause Sarah's death, and we find it inconceivable that Reagan was not prejudiced by these instructions. See Lucas v. O'Dea, 179 F.3d 412, 419 (6th Cir. 1999) (holding that counsel's failure to object to erroneous jury instructions that "rendered his defense . . . meaningless" was prejudicial under Strickland). Because we have granted relief on the first claim, we find it unnecessary to address the conflict of interest claim. The bizarre and somewhat unique factual scenario which created this alleged conflict of interest at the trial fourteen years ago will obviously not be present at retrial.

---

[2]In fact, under the instructions given, a doctor who committed malpractice and caused the death of a child under the age of fourteen could have been convicted of first-degree murder.

## III.   CONCLUSION

We grant Reagan's petition for habeas corpus relief.  He shall be released from custody unless the State of Arkansas moves to retry him within 120 days of the filing of this opinion.

_____