# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-1424

———————

William A. Armstrong,      *
     *
        Appellant,     *
     * Appeal from the United States
    v.             * District Court for the
     * Eastern District of Missouri.
Mike Kemna,        *
     *
       Appellee.      *

———————

Submitted: January 10, 2007
Filed: July 24, 2008

———————

Before RILEY, HANSEN, and SMITH, Circuit Judges.

———————

RILEY, Circuit Judge.

This matter is before our court for the second time. Following William Armstrong's (Armstrong) unsuccessful attempts to obtain relief in the Missouri state courts from his convictions for first degree murder, first degree assault, and armed criminal action, Armstrong applied for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied Armstrong's application. On appeal, we affirmed in part, but remanded to the district court for the limited purpose of considering two ineffective assistance of counsel claims. See Armstrong v. Kemna (Armstrong I), 365 F.3d 622, 630-31 (8th Cir. 2004). On remand, the district court again denied habeas relief. We now reverse.

## I. BACKGROUND

This case originated from the events surrounding a nightclub altercation on January 6, 1996. On that date, Armstrong and a few companions, including his brother Solomon Armstrong (Solomon), his foster brother Antwon Hamilton (Hamilton), and his friend Charles Brown (Brown), had traveled together from their homes in Milwaukee, Wisconsin, to Hayti Heights, Missouri. Later that evening, the group went to a nightclub, where an argument erupted between Terrell McGee and Diane Davis. The argument escalated to involve many other nightclub patrons, including McGee family members, Davis family members, and Armstrong. The nightclub owner ordered everyone involved in the argument outside, and the argument continued in the parking lot. During the melee, several gunshots were fired, killing Carlos McGee, and wounding Yolanda Childress and Devonne Davis.

Armstrong was charged with and tried for one count of first degree murder, two counts of first degree assault, and three counts of armed criminal action. Solomon, Hamilton, and Brown (collectively, the out-of-state witnesses) returned to Milwaukee and did not travel back to Missouri to testify at Armstrong's trial. It is the absence of the out-of-state witnesses from Armstrong's trial and the actions of Armstrong's trial counsel, a Missouri state public defender, that lie at the heart of this second habeas appeal.

At Armstrong's trial, the state presented testimony from nineteen witnesses. Recognizing the importance of the testimonies of the out-of-state witnesses to Armstrong's defense, trial counsel attempted to secure their attendance at trial. One option for doing so existed under the Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings (Uniform Act), which Missouri adopted and enacted in 1959. See Mo. Rev. Stat. § 491.420 (describing procedure for summoning a witness from another state to testify in Missouri). Under subsection 491.420(1),

If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions . . . in this state, is a material witness in a prosecution pending in a court of record in this state, . . . a judge of such court may issue a certificate . . . stating these facts and specifying the number of days the witness will be required. The certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to assure his attendance in this state.

Also under Missouri's Uniform Act, the term "summons" includes "a subpoena, order or other notice requiring the appearance of a witness." Id. § 491.400(2).

Because the Uniform Act is reciprocal and operative only in those states that have adopted it or similar legislation for compelling witnesses to travel to and testify in other states, see New York v. O'Neill, 359 U.S. 1, 4 (1959), trial counsel contacted Wisconsin authorities[1] to determine whether Wisconsin participated in the Uniform Act and how she could subpoena the out-of-state witnesses to testify at Armstrong's trial. Trial counsel inquired whether Wisconsin was "part of the interstate compact" concerning subpoenaing out-of-state witnesses. During a pretrial hearing on July 23, 1996, approximately one month before trial, trial counsel informed the trial court she had contacted the Milwaukee County Sheriff's Department (Sheriff's Department) and determined Wisconsin was "not part of the Interstate Compact for Subpoenaing Witnesses." Trial counsel attempted to communicate to the trial court her understanding regarding the procedure for subpoenaing the out-of-state witnesses, stating the public defender's office would have to pay a witness fee and mileage to the court in the county in which the witnesses were located, upon which a subpoena

---

[1]The record contains conflicting information regarding whether trial counsel contacted the Wisconsin Attorney General's Office, the Milwaukee County (Wisconsin) Sheriff's Department, or both, to inquire about Wisconsin's participation in the Uniform Act. The term "Wisconsin authorities" in this opinion shall refer to both entities, unless specifically noted otherwise.

would be issued.[2] Despite the fact the Sheriff's Department characterized the order as a "subpoena," trial counsel personally believed the subpoena was more akin to and "sounded more like a summons . . . since [Wisconsin was] not part of the interstate compact." Trial counsel then moved for an order allowing Armstrong to proceed in forma pauperis so the public defender's office could avoid a charge from the Sheriff's Department for delivery of the subpoena. The trial court entered this order on July 29, 1996.

Contrary to trial counsel's mistaken belief, Wisconsin *had* adopted and enacted the Uniform Act in 1970. See Wis. Stat. § 976.02 (entitled "Uniform act for the extradition of witnesses in criminal actions"). Subsection 976.02(2), which describes the procedure for summoning witnesses from Wisconsin to testify in another state, provides that if a judge from a state recognizing the Uniform Act certifies a person within Wisconsin is a material and necessary witness in a criminal prosecution, and such certification is presented to a Wisconsin court in the county in which the person is located, the Wisconsin court shall issue a summons directing the witness to testify in the other state's prosecution. Id. § 976.02(2)(a), (b). Like Missouri's Uniform Act, the term "summons" as used in Wisconsin's statutory provision "includes a subpoena order or other notice requiring the appearance of a witness." Id. § 976.02(1).

Notwithstanding trial counsel's earlier representation to the trial court regarding her intent to subpoena the out-of-state witnesses, trial counsel thereafter spoke with her supervisor, and they decided it would be best either to provide the out-of-state witnesses bus tickets to Missouri or to allow them to travel to Missouri themselves and be reimbursed. Trial counsel decided against subpoenaing the out-of-state witnesses because she (mistakenly) believed such subpoenas would be unenforceable.

_____

[2]The state concedes Wisconsin authorities correctly informed trial counsel of the proper procedure under Wisconsin's version of the Uniform Act for subpoenaing witnesses from Wisconsin to testify in another state, and further concedes the record indicates trial counsel was aware of this procedure.

As Armstrong's trial date approached, however, the option to provide bus tickets never materialized because trial counsel's attempts to communicate with the out-of-state witnesses were unsuccessful and, in trial counsel's words, because the out-of-state witnesses "never actually requested that [the public defender's office] make the bus arrangements, so [trial counsel] didn't do that." Approximately one week before trial, trial counsel arranged a conference call to discuss travel arrangements with Solomon and Hamilton. Both Solomon and Hamilton lived with Armstrong's mother. When Armstrong's mother answered the call, she informed trial counsel Solomon was asleep and Hamilton was not home. With regard to Brown, trial counsel's investigator spoke with Brown about six or seven months before trial, but subsequent attempts to contact Brown were unsuccessful.

On the night of August 22, 1996, following the first day of Armstrong's two-day trial, Solomon called trial counsel and stated he would travel by bus to Missouri that night to testify at his brother's trial the next day. Based on Solomon's statements, trial counsel believed Solomon would purchase his own bus ticket and accept reimbursement later. Trial counsel asked Solomon to call her office upon his arrival in Missouri. However, Solomon never contacted trial counsel or showed up at Armstrong's trial.

Thus, on August 23, 1996, the second and final day of Armstrong's trial, trial counsel orally moved for a continuance to allow the out-of-state witnesses time to travel to Missouri to testify. Armstrong interrupted and told the trial court the out-of-state witnesses were absent because trial counsel failed to subpoena them and also failed to clarify whether the state would pay for their costs of traveling to Missouri. According to Armstrong, the out-of-state witnesses lacked sufficient funds to travel to Missouri. Armstrong explained to the court, "I tried to use my power to subpoena, but [trial counsel] never sent them subpoenas." The trial court inquired whether Wisconsin was "part of our Interstate Compact as far as . . . acquiring attendance for out-of-state witnesses." Trial counsel responded, "No. I called the attorney general's

office and they said no." Trial counsel further stated the out-of-state witnesses previously had indicated they would be present at Armstrong's trial, but later failed to make themselves available for phone conferences with her. Armstrong reiterated his previous argument regarding trial counsel's actions and omissions, including the failure to subpoena the witnesses. The trial court rejected Armstrong's argument, relying, in part, on trial counsel's understanding that "Wisconsin was not a part of this Interstate Compact agreement," and noting Armstrong had been aware of his trial date for over two months and "had ample opportunity" to request his family testify at trial. Thus, the trial court denied the motion for a continuance.

Thereafter, the case was submitted, and the jury convicted Armstrong on all counts. Armstrong was sentenced to life imprisonment without parole on the murder count and to 60 years imprisonment on the remaining counts.

After an unsuccessful direct appeal and a motion for post-conviction relief, Armstrong filed an application for a writ of habeas corpus under 28 U.S.C. § 2254. Following an evidentiary hearing at which the district court heard testimony from both trial counsel and Armstrong, the district court denied habeas relief. On appeal, we affirmed in part, but remanded the case to the district court to consider whether, in light of the fact Wisconsin had adopted the Uniform Act, trial counsel's failure to secure the attendance of the out-of-state witnesses or to obtain a continuance constituted ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984). See Armstrong I, 365 F.3d at 630-31.[3]

On remand, the district court again denied Armstrong's application for habeas relief. The district court found trial counsel took reasonable steps to discern whether

_____

[3]In Armstrong I, we noted the record was void of any reference to either Missouri's or Wisconsin's version of the Uniform Act, despite those two statutes being "critical to disposing of Armstrong's ineffective assistance claims." Armstrong I, 365 F.3d at 628.

Wisconsin had adopted the Uniform Act and was justified in relying on information from the Wisconsin authorities that Wisconsin did not participate in the Uniform Act. Thus, trial counsel's decision not to issue what she believed would be an unenforceable subpoena fell "within the wide range of professionally competent assistance sanctioned by Strickland." Additionally, the district court held trial counsel took reasonable steps to attempt to secure the out-of-state witnesses' attendance and was not required to forward bus tickets unilaterally without ever having discussed specific travel arrangements with the witnesses. With regard to the continuance issue, the district court found Armstrong failed to demonstrate prejudice as required under Strickland. This appeal followed.

## II.  DISCUSSION

### A.  Standard of Review

As we noted in Armstrong I, although the Missouri state courts did not review Armstrong's ineffective assistance claims on the ground that Armstrong filed his state post-conviction relief motion late, the district court found cause to avoid procedural default on the claims.[4] Armstrong I, 365 F.3d at 627 n.2. Because there is no state court adjudication of these issues, we need not apply the deferential standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. See Reagan v. Norris, 365 F.3d 616, 621 (8th Cir. 2004). Instead, we review the district court's factual findings for clear error and its legal conclusions de novo. Id.

---

[4]Citing the Supreme Court's decision in Day v. McDonough, 547 U.S. 198 (2006), the state urges this court for the first time in these habeas proceedings to consider, sua sponte, whether Armstrong's habeas application is untimely. Because a statute of limitations defense "is not 'jurisdictional,'" we "are permitted, but not obligated, to consider" the timeliness of Armstrong's application. Id. at 205, 209 (citations omitted). We decline the state's invitation to do so, given our conclusion "'the interests of justice would be better served' by addressing the merits" of the habeas application before us. See id. at 210 (quoting Granberry v. Greer, 481 U.S. 129, 136 (1987)).

**B. Ineffective Assistance of Counsel**

To succeed on a Sixth Amendment ineffective assistance of counsel claim, Armstrong must demonstrate (1) trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687-94. "Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." Middleton v. Roper, 455 F.3d 838, 846 (8th Cir. 2006) (quoting Bucklew v. Luebbers, 436 F.3d 1010, 1016 (8th Cir. 2006) (quoting Strickland, 466 U.S. at 689)), cert. denied, 127 S. Ct. 980 (2007). To avoid second-guessing trial counsel's assistance in the face of a guilty verdict, we make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689).

**1. Trial Counsel's Performance**

We first address trial counsel's failure to secure the attendance of the out-of-state witnesses in light of the Uniform Act. The district court found—and we agree—trial counsel evidenced her familiarity with Missouri's participation in the Uniform Act when she contacted Wisconsin authorities. We take issue, however, with the district court's determination that trial counsel took reasonable steps to investigate Wisconsin's participation in the Uniform Act. When conversing with Wisconsin authorities, trial counsel used unclear or imprecise (and perhaps even incorrect) terminology by inquiring whether Wisconsin was "part of the interstate compact" for subpoenaing out-of-state witnesses. Thus, it should come as no surprise Wisconsin authorities did not recognize the law to which trial counsel referred and denied Wisconsin's participation. Notwithstanding trial counsel's misstatement, the record indicates—and the state of Missouri concedes—Wisconsin authorities *correctly* informed trial counsel of the proper procedure under Wisconsin's version of the

Uniform Act for subpoenaing witnesses from Wisconsin to testify in another state. In our view, this information, which mirrored the procedure for subpoenaing witnesses under Missouri's Uniform Act, should have alerted trial counsel of Wisconsin's adoption of the Uniform Act, and of her ability effectively to subpoena the out-of-state witnesses. At the very least, trial counsel had a duty to investigate the law further in the face of unclear information, rather than relying solely upon the statements of Wisconsin authorities.

The district court found that, despite trial counsel's repeated references to the "interstate compact" in describing her conversation with Wisconsin authorities, trial counsel in fact meant to refer to the Uniform Act, noting trial counsel's specific reference to the Uniform Act in the motion for a new trial filed on Armstrong's behalf. Thus, the district court concluded "trial counsel was justified in believing the Wisconsin State Attorney General's Office . . . when it informed her Wisconsin did not participate in the *Uniform Act*." (emphasis added). We disagree. The record does not support such an interpretation of trial counsel's communications with Wisconsin authorities. A review of trial counsel's colloquies with the trial court and her testimony during the district court's evidentiary hearing in these habeas proceedings indicates trial counsel repeatedly referred to the "interstate compact," rather than referencing the Uniform Act itself. The district court's finding wholly ignores the relevance of trial counsel's misstatement when inquiring about Wisconsin's participation in the "interstate compact," her familiarity with Missouri's adoption of the Uniform Act, and her awareness of Wisconsin's subpoena procedure. The court's finding borders on illogical circularity to deem trial counsel's belief reasonable when it was trial counsel's misstatement which led Wisconsin authorities to deny participation in the "interstate compact." The reasonableness of trial counsel's conduct is further challenged by the fact that, despite trial counsel's misstatement, Wisconsin authorities nevertheless correctly informed trial counsel how to subpoena witnesses from Wisconsin by using a process substantially similar to Missouri's subpoena process under the Uniform Act.

Indeed, the sole basis for trial counsel's belief she could not effectively subpoena the out-of-state witnesses, and that any subpoena would be unenforceable, appears to have arisen solely from her inexplicable belief that Wisconsin was "not part of the interstate compact." Armstrong's cross-examination of trial counsel during the district court's evidentiary hearing is illustrative of trial counsel's confusion on this point:

| [Armstrong:] | Okay. So is it a subpoena or is it a summons? |
|---|---|
| [Trial counsel:] | [Wisconsin authorities] call it a subpoena, but it sounded more like a summons to me since [Wisconsin was] not part of the interstate compact. |
| [Armstrong:] | Well, wouldn't a subpoena be a summons? A subpoena is a summons for you to appear somewhere. |
| [Trial counsel:] | It's my understanding that a subpoena has—is enforceable. If a person does not show up, then the judge can issue a warrant and that person can be arrested. It's my understanding that the summons does not have that power behind it. |
| [Armstrong:] | Well, couldn't the Court do the same? If the Court in Milwaukee, Wisconsin, issued a summons for the witnesses, wouldn't they be authorized—if the witnesses didn't show up . . . wouldn't they have the authority to arrest those witnesses? |
| [Trial counsel:] | It's my understanding, since [Wisconsin was] not part of the interstate compact, no, they would not do that. |

This exchange further emphasizes trial counsel's mistaken logic, for even assuming trial counsel could have reasonably believed the subpoena "sounded more like a summons" and thus would be unenforceable, a cursory review of Missouri's Uniform Act and the Wisconsin Uniform Act would have revealed the term "summons"

-10-

includes "a subpoena, order or other notice requiring the appearance of a witness." See Mo. Rev. Stat. § 491.400(2); see also Wis. Stat. § 976.02(1).

As the Supreme Court noted in Strickland, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. On the other hand, strategic choices "resulting from lack of diligence in preparation and investigation [are] not protected by the presumption in favor of counsel." Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991); see also Wiggins v. Smith, 539 U.S. 510, 527 (2003) ("Strickland does not establish that a cursory investigation automatically justifies a tactical decision . . . . Rather, a reviewing court must consider the *reasonableness* of the investigation said to support that strategy." (citing Strickland, 466 U.S. at 691)). Evaluating the reasonableness of trial counsel's conduct from her perspective before and during the trial, we cannot say trial counsel satisfied her duty to investigate thoroughly and diligently the law relevant to subpoenaing the out-of-state witnesses. Given trial counsel's familiarity with Missouri's own participation in the Uniform Act, her awareness of Wisconsin's subpoena procedure under the Uniform Act, and the importance of securing the out-of-state witnesses' attendance at trial, we believe a reasonably competent attorney would have investigated and researched the law further to determine her authority—and, in this case, her certain ability—to subpoena the out-of-state witnesses.

Operating under the mistaken assumption regarding the enforceability of any potential subpoenas, trial counsel believed she had only two options to get the out-of-state witnesses to attend Armstrong's trial: (1) issue subpoenas, which trial counsel believed would be unenforceable in the event the out-of-state witnesses failed to attend trial; or (2) allow the out-of-state witnesses to travel to Missouri on their own initiative and either provide bus tickets to them in advance or reimburse their travel expenses later. Trial counsel admitted she was skeptical the witnesses would attend Armstrong's trial "since they wouldn't make themselves available for phone calls."

-11-

Furthermore, Armstrong told trial counsel on several occasions the out-of-state witnesses lacked sufficient funds to travel to Missouri. Thus, whether or not trial counsel personally believed the subpoenas would be unenforceable if the witnesses failed to attend Armstrong's trial, we find it difficult to understand the logic of trial counsel's decision to forego even attempting to subpoena the witnesses, particularly when Armstrong's trial date drew near, when trial counsel was unsuccessful in her attempts to contact the witnesses to make alternative arrangements, and when the witnesses lacked funds to travel at their own expense. See Garton v. Swenson, 417 F. Supp. 697, 702 (W.D. Mo. 1976) ("The notion that a witness could and would travel at his own expense rather than at the State's is untenable on its face, to say nothing of the risk involved in failing to have an important witness under subpoena."). In defending the reasonableness of trial counsel's conduct, the state characterizes the out-of-state witnesses as uncooperative and unmotivated to travel to Missouri, yet such characterizations only further emphasize the importance of (1) trial counsel's need to determine whether she could subpoena the witnesses and compel them to attend Armstrong's trial, and (2) subpoenas to compel attendance. Furthermore, as we indicated in Armstrong I, "[r]egardless of the amount or lack of assistance provided to trial counsel by Armstrong and his witnesses, the proper focus is on trial counsel's performance." Armstrong I, 365 F.3d at 628 n.3.

We agree with the district court that trial counsel was not required to unilaterally forward bus tickets to the out-of-state witnesses without having discussed specific travel arrangements with them. However, it is difficult to separate or uncouple trial counsel's later course of conduct from her initial decision not to subpoena the out-of-state witnesses when that decision was based on trial counsel's inadequate and incomplete investigation of the applicable law. "Counsel need not attain perfection, but he [or she] must exercise reasonable diligence." Laws v. Armontrout, 863 F.2d 1377, 1386 (8th Cir. 1988) (en banc) (quotation omitted). Trial counsel did not exercise reasonable diligence; thus, Armstrong satisfied the first prong of Strickland.

## 2.    Prejudice to Armstrong's Defense

Having concluded Armstrong has satisfied the first prong of Strickland, we now consider whether trial counsel's deficient performance prejudiced Armstrong's defense.  To demonstrate Strickland prejudice, Armstrong "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.  To conduct this analysis, we are required to add the expected testimony of the three out-of-state witnesses to the totality of evidence that was actually presented at trial.  See McCauley-Bey v. Delo, 97 F.3d 1104, 1105-06 (8th Cir. 1996), cert. denied, 520 U.S. 1178 (1997).

In our previous opinion, we remanded to the district court for reconsideration of Armstrong's ineffective assistance of counsel claims.  In doing so, we directed the district court to "address *both prongs* of the Strickland analysis, providing the court's findings of fact and conclusions of law."  Armstrong I, 365 F.3d at 628 (emphasis added).  Despite our clear instruction, the district court concluded Armstrong's trial counsel was not ineffective under the first prong of Strickland and failed to address the Strickland prejudice prong.  The district court cursorily concluded Armstrong demonstrated no prejudice on account of his trial counsel's failure to secure a continuance, but the court engaged in no analysis of whether there is a reasonable probability the result of Armstrong's trial would have been different had his trial counsel properly secured the testimony of the out-of-state witnesses.  Because the district court failed to follow our instruction to address both prongs of the Strickland analysis, we are now faced with addressing the prejudice inquiry for the first time in these proceedings.  For the reasons described below, we conclude the existing record is inadequate for this purpose, in part, because Armstrong has not been given an adequate opportunity to present competent evidence of the out-of-state witnesses' expected testimony.  We reverse and remand for further development of the record

-13-

and so that the district court may conduct the Strickland prejudice analysis in the first instance. See, e.g., Briggs v. Pa. R. Co., 334 U.S. 304, 306 (1948) (observing that the Supreme Court has "consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court" (citations omitted)); United States v. Montgomery, 462 F.3d 1067, 1072 (9th Cir. 2006) ("Failure to follow this court's instructions on remand is grounds for the case to be re-remanded for compliance with our instructions." (citations omitted)); see also Burns v. Gammon, 173 F.3d 1089, 1094 (8th Cir. 1999) (remanding and declining to address in the first instance whether the § 2254 petitioner demonstrated deficient performance and prejudice under Strickland).

As it stands, the record fails to disclose, with any degree of reliability, just what testimony the absent witnesses would have given at Armstrong's trial, a deficiency that has plagued this case from the start. See Armstrong I, 365 F.3d at 625, 628 n.3 (noting the state trial court "was not provided the absent witnesses' expected testimony" when it denied Armstrong's midtrial request for a continuance to secure their attendance). Because Armstrong's motion for state postconviction relief was untimely, no motion hearing was held. And none of the absent witnesses testified at the § 2254 hearing.

Instead, the existing record's limited disclosure of the expected content of the three absent witnesses' testimony is derived from two sources: Armstrong's representations in his § 2254 application and his trial counsel's testimony at the district court's habeas hearing held six years after the shooting. As our prior opinion notes, Armstrong alleged the following in his federal habeas application: "[W]itnesses would have testified that I did not have a weapon, nor was I arguing with anybody, and that someone else from the McGee family were [sic] shooting at us. Someone who they were arguing with in the club." Id. at 625. No bases for those allegations (except that they match Armstrong's own trial testimony) are set out in the application.

At the initial federal habeas hearing, Armstrong's trial counsel testified the only witness she was certain she spoke with before the trial was Solomon. She also testified her investigator had talked to all three of the witnesses by telephone on at least one, and maybe two, occasions. According to counsel, Brown told the investigator (1) he observed an argument in the bar between a male and a female, (2) someone from his group interceded, (3) he heard the shots as he exited the club, and (4) he never saw Armstrong with a gun. Counsel also testified that, based on conversations she had with her investigator, she believed Hamilton and Solomon would have given similar testimony, including testimony Armstrong "did not have a gun . . . [and] did not shoot [the victims]." Counsel specifically testified she did not know and did not remember whether either witness would have testified to having seen the shooting take place.

Absent from this record is so much as a signed statement, let alone an affidavit or a sworn evidentiary deposition, from any of the three absent witnesses (one of whom is Armstrong's brother) indicating what their actual testimony would have been at the original trial. Instead, we have only raw, untested hearsay, most of which is twice removed (the declarant witnesses told the investigator who told trial counsel who testified at the § 2254 hearing to the content of the secondhand, out-of-court statements). Even though this hearsay testimony drew no objections during the hearing—in fact, the State or the district court elicited the majority of the hearsay testimony—we do not think that fact gives us license to disregard wholly the diminished probative value of this evidence. The Federal Rules of Evidence do apply to § 2254 proceedings. See Fed. R. Evid. 1101(e).

"Ordinarily, a defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony . . . would be fatal to an ineffective assistance of counsel claim." Harrison v. Quarterman, 496 F.3d 419, 428 (5th Cir. 2007) (citations omitted). Because of the inherently abstract nature of our Strickland prejudice inquiry in the uncalled-witness context, see Evans v. Cockrell,

-15-

285 F.3d 370, 377 (5th Cir. 2002) ("[C]omplaints of uncalled witnesses are not favored . . . because allegations of what the witness would have testified are largely speculative." (citation omitted)), federal appellate courts generally insist on a more precise and more reliable showing of the uncalled witnesses' expected testimony than the showing made in the existing record. See Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) ("[I]f potential trial witnesses are not called to testify at a postconviction review hearing, the petitioner ordinarily should explain their absence and demonstrate, with some precision, the content of the testimony they would have given at trial." (citation and internal quotation marks omitted)); see also Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (observing that, in this context, a showing of Strickland prejudice "must be made based on the potential witness's testimony to the habeas court."(citation omitted)); United States ex rel. Partee v. Lane, 926 F.2d 694, 701 (7th Cir. 1991) ("[A] habeas court cannot even begin to apply Strickland's standards to . . . a [missing witness] claim unless and until the petitioner makes a specific, affirmative showing as to what the missing evidence or testimony would have been. Without such a showing, it is . . . nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance." (citation and internal quotation marks omitted)).

But we conclude Armstrong should not be required to rest his appeal on the basis of the existing record because Armstrong, who was without counsel at the § 2254 hearing,[5] was not given an adequate opportunity to develop the record with respect to the out-of-state witnesses' expected testimony. At the first evidentiary

---

[5]It is unclear to us why Armstrong did not receive counsel for the first evidentiary hearing. "The interests of justice require the court to appoint counsel when the district court conducts an evidentiary hearing on the petition." Hoggard v. Purkett, 29 F.3d 469, 471 (8th Cir. 1994) (citations omitted); see Rule 8(c), Rules Governing Section 2254 Cases in the United States District Courts ("If an evidentiary hearing is warranted, the judge *must* appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A." (emphasis added)).

hearing, the district court focused primarily on the first <u>Strickland</u> prong and dismissed Armstrong's argument that if he had legal counsel he "could have been prepared by having [his] brothers . . . personally testif[y] . . . before the Court." The district court replied, "the issue here is not having them testify in front of me . . . it would not have helped at all to have . . . your friends, brother, and your mother here." On remand, the district court declined to hold a second evidentiary hearing and, contrary to our express instructions, again primarily confined its analysis to the first prong of <u>Strickland</u>. Thus, Armstrong had little opportunity to improve the state of the record following our remand. In the proceedings following this second remand, Armstrong should have an adequate opportunity to present further evidence of what the three out-of-state witnesses would have testified to had they been properly secured to testify at Armstrong's trial.

## III.    CONCLUSION

The district court's judgment denying Armstrong's § 2254 application is reversed. The case is once again remanded to the district court to provide Armstrong with a fair opportunity to develop the record concerning the actual content of the absent witnesses' testimony, and for the district court to conduct an analysis of whether Armstrong has demonstrated prejudice under <u>Strickland</u>.

——————————————————————

-17-