# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2495

_____

William A. Armstrong,           *
                                *
          Appellee,             *
                                *   Appeal from the United States
    v.                          *   District Court for the Eastern
                                *   District of Missouri.
Mike Kemna,                     *
                                *
          Appellant.            *

_____

Submitted: September 22, 2009
Filed:  January 5, 2010

_____

Before RILEY, HANSEN, and SMITH, Circuit Judges.

_____

RILEY, Circuit Judge.

       This case is before us for the third time.  After William A. Armstrong
(Armstrong) was convicted in Missouri state court of first-degree murder and various
other charges, Armstrong filed an application for a writ of habeas corpus pursuant to
28 U.S.C. § 2254.  The district court denied Armstrong's application, and this court
remanded for the district court to consider Armstrong's claims of ineffective
assistance of counsel.  See Armstrong v. Kemna, 365 F.3d 622, 630 (8th Cir. 2004)
(Armstrong I).  The district court found Armstrong's counsel acted reasonably and
again denied Armstrong's application.  On appeal, this court found Armstrong's
counsel did not exercise reasonable diligence and remanded for the district court to
determine whether counsel's errors prejudiced Armstrong.  See Armstrong v. Kemna,

534 F.3d 857, 866, 868 (8th Cir. 2008) (Armstrong II). On remand, the district court found Armstrong was prejudiced and granted Armstrong's application for habeas relief. The government appeals the district court's finding of prejudice. We reverse and deny the writ.

## I.     BACKGROUND

At approximately 11:00 p.m., on January 5, 1996, Armstrong and his companions—Armstrong's biological brother, Solomon Armstrong (Solomon); Armstrong's foster brother, Antwon Hamilton (Antwon); Antwon's biological brother, Tyreese Hamilton (Tyreese); and Armstrong's friend, Charles Brown (Brown)—decided to drive from Milwaukee, Wisconsin, to Hayti Heights, Missouri, to visit Antwon's and Tyreese's biological family. The group arrived in Hayti Heights on January 6, 1996, at approximately 6:30 or 7:00 a.m., and drove to 108 North Martin Luther King Drive. Armstrong later learned it was the residence of Channelle Davis (Channelle), Antwon's and Tyreese's cousin.

That evening, several people came to Channelle's residence, and the group eventually decided to go to C.J.'s, a local nightclub. While the group was at C.J.'s, an argument erupted between Diane Davis (Diane)[1] and Terrell McGee (Terrell), who were dating. The argument became heated, and several people witnessed Terrell slap, push, or grab Diane. Tyreese joined in the argument to defend his cousin, Diane, which prompted Terrell's brother, Carlos McGee (Carlos), to join in the argument to protect Terrell. As the argument escalated, other friends and family members of the Davises, including the Hamiltons and the Armstrongs, became involved in the altercation with the McGees. The bar owner, Charles Jones (Jones), pulled out a handgun and ordered everyone out of the bar. Those involved in the argument left the

---

[1]Most of the Davises referenced in this opinion are siblings. Diane is the sister of Channelle, Levonne, J., Devonne, and T. Davis. Each of the Davis siblings are cousins of Antwon and Tyreese, and several of them were also friends with Armstrong.

bar and resumed the argument in the parking lot. During the melee, several gunshots were fired, killing Carlos, and wounding Devonne Davis (Devonne) and Yolanda Childress (Yolanda).[2]

After the shootings, Armstrong's companions—Solomon, Antwon, Tyreese, and Brown—returned to Milwaukee, Wisconsin, and did not return to Missouri for Armstrong's trial. A jury convicted Armstrong of first-degree murder, two counts of first-degree assault, and three counts of armed criminal action.

Following an unsuccessful direct appeal and a motion for post-conviction relief in the Missouri courts, Armstrong filed an application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Eastern District of Missouri. Armstrong raised various grounds for relief, including a claim that Armstrong's trial counsel was ineffective in failing to secure the testimony of Armstrong's out-of-state witnesses. The district court held an evidentiary hearing on February 14, 2002.

Before discussing the merits of Armstrong's application, the district court recognized Armstrong's state post-conviction motion was filed five days late. As a result, the claims in his habeas application were procedurally defaulted. The district court determined that a state-employed prison librarian provided Armstrong with the wrong deadline for filing his post-conviction motion; therefore, Armstrong demonstrated cause to excuse his procedural default. However, the district court concluded Armstrong's "claim of ineffective assistance of counsel . . . is without merit, and, therefore, he cannot demonstrate prejudice arising from his procedural default of the issue."

---

[2]Yolanda is a cousin of Carlos and Terrell.

Armstrong appealed, and this court remanded "for the limited purpose of considering whether trial counsel's failure to secure the attendance of the out-of-state witnesses or a continuance in light of the Uniform Act [To Secure the Attendance of Witnesses From Without the State in Criminal Proceedings] constituted ineffective assistance of counsel under Strickland."[3] Armstrong I, 365 F.3d at 630. On remand, the district court again denied Armstrong's application for habeas relief. The district court concluded Armstrong's "trial counsel took reasonable steps to secure" the testimony of Armstrong's out-of-state witnesses, and counsel's actions "were sufficient to satisfy her burden under Strickland." With regard to the continuance issue, the district court found Armstrong failed to demonstrate sufficient prejudice as required under Strickland.

On appeal, this court concluded Armstrong's trial counsel did not exercise reasonable diligence and failed to take sufficient measures to secure the attendance of out-of-state witnesses. See Armstrong II, 534 F.3d at 865-66. Thus, we found Armstrong satisfied the first Strickland prong, which requires defendants to show trial counsel's performance fell below an objective standard of reasonableness. See id. at 866; Strickland v. Washington, 466 U.S. 668, 688-91 (1984). Because the record did not contain sufficient evidence to determine whether Armstrong was prejudiced by the absence of the out-of-state witnesses at trial, this court "remanded to the district court to provide Armstrong with a fair opportunity to develop the record concerning the actual content of the absent witnesses' testimony, and for the district court to conduct an analysis of whether Armstrong has demonstrated prejudice under Strickland." Armstrong II, 534 F.3d at 868.

On January 20, 2009, the district court held a second evidentiary hearing. Four witnesses testified at the hearing, including (1) Armstrong; (2) Armstrong's biological brother, Solomon; (3) Armstrong's foster brother, Antwon; and (4) Erik Thomas

---

[3]Strickland v. Washington, 466 U.S. 668 (1984).

(Thomas), a witness for the government. After the hearing, the district court concluded Armstrong was prejudiced by the absence of Solomon and Antwon from Armstrong's trial; therefore, Armstrong satisfied the second Strickland prong. The district court granted Armstrong's application for habeas relief. The government appeals claiming (1) the district court erred in finding Strickland prejudice; and (2) even if Armstrong were prejudiced under Strickland, Armstrong has not shown he was sufficiently prejudiced to overcome his procedural default.

## II.    DISCUSSION

### A.    Standard of Review

"When considering an appeal from the granting of habeas corpus relief on the ground of ineffective assistance of counsel, this court may engage in its own independent review of the district court's conclusion, because the issue of ineffective assistance of counsel presents a mixed question of law and fact." Laws v. Armontrout, 863 F.2d 1377, 1381 (8th Cir. 1988) (en banc) (citations omitted). "The district court's findings of fact, however, are reviewable under the clearly erroneous standard." Id. (citations omitted).

### B.    Strickland Prejudice

"To show prejudice [under Strickland], '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." McCauley-Bey v. Delo, 97 F.3d 1104, 1105 (8th Cir. 1996) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is one sufficient to undermine confidence in the outcome." Id. (citation omitted). "'[I]n determining the existence *vel non* of prejudice, the court must consider the totality of the evidence before the judge or jury.'" Id. (internal marks omitted) (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). Thus, to conduct our analysis, we should add the testimony of Armstrong's uncalled witnesses to the body of evidence actually presented at his trial. See id. at 1105-06. In doing so, we shall consider: "(1) the credibility of all witnesses, including the likely impeachment of the

uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." Id. at 1106.

### 1. State's Trial Evidence

We begin our analysis by evaluating "the strength of the evidence actually presented by the prosecution." Id. At Armstrong's trial, nineteen people testified for the state. These nineteen witnesses essentially comprise four different groups: (1) staff from C.J.'s nightclub, (2) relatives of the Davises, (3) friends and relatives of the McGees, and (4) police and other investigators or medical personnel.

### a. Nightclub Staff

Jones, the owner of C.J.'s nightclub, testified that on the night of January 6, 1996, he witnessed Diane and Terrell pushing and arguing with each other inside his bar. Jones stated the situation began to escalate as other people became involved in the argument, so Jones took a handgun from his pocket and ordered those involved to leave the bar. Jones did not see anyone else with a gun, but stated Armstrong looked like he might have a gun, based upon the way Armstrong put his hand in his right pocket and "backed sideways outside the door."

Charles Doby (Doby) was working as the doorman at C.J's nightclub on January 6, 1996. Doby testified Armstrong went to the back of the club and got a gun from someone. When Armstrong was standing beside Doby, Armstrong pulled the gun out of his pocket and raised it up, not aiming at anyone, and Armstrong made some gang references. Doby told Armstrong to get out of the bar, Armstrong left the bar, and sometime thereafter, Doby heard shots fired outside. Doby did not see anyone else with a gun that night.

### b.    The Davises[4]

Six Davis siblings testified at Armstrong's trial. Levonne Davis (Levonne) testified she met Armstrong before the date of the shooting when she went to visit her cousins, Antwon and Tyreese, in Milwaukee. The other Davis siblings did not say whether they knew Armstrong before the date of the shooting,[5] but they all visited with Armstrong on January 6, 1996, when he stayed at Channelle's house. That evening a group of people, including the Davises, the Hamiltons, the Armstrongs, and Terrell, gathered at Channelle's house. J. Davis (J.), who was sixteen, testified he saw Armstrong with a gun on the table at Channelle's house. J. also saw the gun in Armstrong's hand.

Later, the group decided to go to C.J.'s nightclub. Two trips were made to the bar that night. The first trip consisted only of the Armstrongs, the Hamiltons, and Brown. Armstrong testified that after about one hour at the bar, his brothers could not drive because they had been drinking heavily so Armstrong returned to Channelle's house and picked up the others. Although there is some confusion about who was in the vehicle during the second trip to the nightclub, most parties said Armstrong returned to Channelle's residence and drove Channelle, Devonne, Diane, Terrell, and another young woman named Diane Vaughn, back to C.J.'s nightclub. Channelle testified she was in the front passenger seat of Armstrong's vehicle when she saw a gun in the car Armstrong was driving. Channelle stated the radio had been removed from the vehicle, and a gun, which was covered with wires, had been placed in the radio compartment.

---

[4]Diane, Channelle, Levonne, J., Devonne, and T. Davis testified. We need not reference T.'s testimony as he was not present at the time of the shootings at issue in this appeal.

[5]Armstrong testified he previously met both Levonne and Devonne during their visits to Milwaukee.

Inside the nightclub, J., Diane, Devonne, and Channelle, each testified Diane and Terrell became involved in an argument which began to escalate as more people got involved. Some of the Hamiltons and the Armstrongs intervened in the dispute on Diane's behalf, while some of the McGees intervened on Terrell's behalf. At that point, Jones, the bar owner, displayed a handgun and ordered the group out of the bar. Devonne testified she saw Armstrong with a gun while inside the bar. Channelle testified Armstrong was yelling, "G.D.," which stands for "Gangster Disciple." Diane also heard Armstrong yelling "G.D.," but Diane did not know what it meant.

After Jones ordered everyone to leave the nightclub, Levonne, J., Devonne, Channelle, and Diane each testified they went outside and stood in the parking lot. Each testified the argument continued outside the nightclub and they saw Armstrong with a gun. Devonne, Channelle, and Diane testified they did not see anyone else in the parking lot with a gun. Levonne witnessed Armstrong shooting down toward the ground at Carlos, who had fallen. Devonne stated she saw Armstrong shoot at Carlos, saw Carlos fall to the ground, and observed Armstrong begin shooting down toward the ground. Channelle witnessed Armstrong shoot at Carlos as Carlos tried to run away, Channelle then saw Carlos get shot and fall to the ground. Diane also testified Armstrong began shooting at Carlos and Carlos fell to the ground. J. said he saw Armstrong shooting, but J. ducked and did not see who Armstrong was shooting toward. Devonne related that as Armstrong was firing at Carlos, Armstrong also shot Devonne and Yolanda.

Immediately after the shooting, Armstrong, Solomon, Antwon, Tyreese, and Brown ran to Solomon's car in an attempt to flee. Both Devonne and Levonne testified Devonne, wounded, followed the men to Solomon's car and got in the car. When the men realized the car was stuck in mud, the men left the car and ran to Channelle's residence, leaving Devonne behind.

-8-

Armstrong, Solomon, Antwon, and Tyreese were arrested soon after the shooting and, with the exception of Armstrong, they were released the following day. After their release, the men returned to Milwaukee. Devonne and J. also traveled to Milwaukee after the shooting and J. testified he stayed for about one year.

### c.     Friends and Relatives of the McGees

Several friends and relatives of the McGees were at C.J.'s on the night of January 6, 1996, including Terrell and Carlos, their mother Rosie McGee (Rosie), Rosie's live-in boyfriend, Steve Winters (Steve), and Steve's cousin, Michael Winters (Michael). Also present were Terrell's and Carlos's first cousins, Yolanda and Felicia Moore (Felicia). Terrell, Rosie, Michael, Yolanda, and Felicia each testified at Armstrong's trial.

Terrell met Armstrong earlier that day at Channelle's house. Terrell testified he saw Armstrong with a gun at Channelle's house and Armstrong stated he had the gun so "when he go to the club, nobody trip with him." Terrell also reported that on the way to the bar, Terrell noticed the radio was missing from the car Armstrong was driving, and there was a gun in the radio compartment.

Later that evening, after Terrell and Diane began to argue at the bar, Yolanda, Michael, Felicia, and Terrell each described Armstrong becoming involved in the argument, pulling a handgun, and "hollering G.D." Rosie denied seeing Armstrong with a gun inside the bar, but someone told her Armstrong had a gun. Jones drew his gun and told the group to leave the bar. The argument resumed in the parking lot, and Terrell, Rosie, Michael, Yolanda, and Felicia affirmed they saw Armstrong take out a gun and begin to fire, resulting in Carlos's death and wounding Devonne and Yolanda. After the shooting, Armstrong and his group fled.

### d.    Police, Investigators, and Medical Personnel[6]

Officer Durrell Hayes (Officer Hayes) and Deputy Sheriff Billy Woodall (Deputy Woodall) went to 108 North Martin Luther King Drive to arrest Armstrong, Solomon, Antwon, and Tyreese, for their suspected involvement in the shootings. Officer Hayes and Deputy Woodall testified that during the arrest, shots were fired from outside the house, hitting Officer Hayes in the chest. Emerson Branch, a relative of the McGees, was later tried and convicted of shooting Officer Hayes.

Deputy Sheriff Len Welsh (Deputy Welsh) was also involved in the shooting investigation and reported on the evidence collected during the investigation. Deputy Welsh described how a .32 caliber bullet was removed from Officer Hayes, and a .32 caliber bullet was found on Carlos's gurney.

Andy Wagoner (Wagoner) is a firearms and tool marks examiner at the Southeast Missouri Regional Crime Laboratory. In addition to the .32 caliber bullet found on Carlos's gurney, Wagoner testified another .32 caliber bullet was removed from Carlos during an autopsy. Wagoner testified the bullet on Carlos's gurney and the bullet removed from Carlos's body were fired from the same gun. Wagoner concluded the bullet removed from Officer Hayes was fired from a different gun than the bullets identified with Carlos because Carlos's two bullets had class characteristics "that [were] six lands and grooves inclined to the left," and the bullet taken from Officer Hayes had class characteristics "that [were] five lands and grooves inclined to the right." No gun was ever recovered and the gunshot residue tests performed on Armstrong, Solomon, Antwon, and Tyreese, proved inconclusive.

---

[6]The state presented testimony from the coroner and from the doctor who performed Carlos's autopsy, but their testimony is not relevant for purposes of this appeal.

### 2. Actual Defense Witnesses and Uncalled Witnesses
#### a. Actual Defense Witnesses

The defense called three witnesses to testify at trial on Armstrong's behalf. First, the defense recalled Felicia who previously told a police officer she heard Armstrong's gun make a clicking sound. Armstrong's defense counsel may have been attempting to show Armstrong's gun was not the same type of gun as the gun used to shoot the three victims at C.J.'s nightclub.

The second witness, Tonya Williamson (Tonya), Jones's niece, saw part of the argument between Diane and Terrell. Tonya also explained how other bar patrons became involved in the altercation, and she heard Rosie encouraging her sons to fight. Tonya stated that during the argument, her uncle pushed everyone outside and ordered Tonya and her sister to go back inside, and they hid behind the bar. Tonya did not see anyone with a gun inside the bar that night, but she knew her uncle kept a gun at the bar.

Armstrong was the third and final witness for the defense. Armstrong testified he went to Hayti Heights, Missouri, with Solomon, Antwon, Tyreese, and Brown to visit Antwon's and Tyreese's cousins. Armstrong referred to Solomon, Antwon, and Tyreese as his brothers. Armstrong explained the group went to Channelle's residence, played ball, slept, and then decided to go out. Armstrong and his brothers went to C.J.'s, where his brothers were "drinking real heavy," and could not drive. Armstrong stated he only had a couple of drinks, so he went to pick up Channelle, Terrell, Devonne, Diane, and Diane Vaughn, and brought them back to C.J.'s. Armstrong admitted there was a hole in the car dashboard where the radio should have been, but Armstrong denied having a gun in the radio compartment. Armstrong also denied observing an argument inside the nightclub.

Armstrong said he was having a conversation with Jones, when Jones exclaimed, "[W]ait a minute," got up, and ran past Armstrong to the back of the bar.

Armstrong described how all the club patrons rushed outside. Armstrong did not know where his brothers were, so he started calling for them, and then he heard Tyreese's voice outside. Armstrong slipped through the people crowded at the door, and was still standing in the club when Armstrong asked Tyreese what was happening. Tyreese said, "man, they all here tripping." Armstrong claimed he tried to encourage Tyreese to "just let it go," when a man behind Armstrong said, "get out, get out, get out," and showed Armstrong a gun. Armstrong does not know who the man was, and said the man did not testify. Armstrong claimed he had never seen a gun before, so he put his hands in the air and said, "okay, man, let me get my coat." Armstrong grabbed his coat and walked backwards outside.

Armstrong testified he saw Tyreese, Diane, and Antwon standing eight to fifteen feet from the door, while Diane and Terrell were arguing with some other people. Armstrong stated he asked Tyreese what was going on and tried to calm Tyreese down by stating, "we didn't come down here for that, let's go." Armstrong said Tyreese stopped arguing and responded, "all right, let's go." Armstrong described how he walked over to get Antwon, but Antwon was engaged in an argument in another area of the parking lot and refused to leave. Armstrong reported he began walking toward Carlos, but Michael cut Armstrong off and stated, "I advise you to get your brothers." Armstrong testified, the man had his hands in his pockets and "the way he looked at me, he made a straight eye contact. . . . And at that time I felt that maybe he had a gun on him." Armstrong stated he backed away from Michael and walked to Antwon who was telling the crowd he would fight them all. The crowd approached them and Antwon asked, "What's up?" Armstrong claims someone responded, "this is what's up," and started shooting.

Armstrong ran to the car, but it was stuck in the mud. As the group tried to get the car out of the mud, the same person started shooting again, so they ran to 108 North Martin Luther King Drive to hide. Armstrong insisted he did not brandish a gun at C.J.'s nightclub, and he did not shoot Carlos, Devonne, or Yolanda.

-12-

During cross-examination, the prosecutor asked, "are you saying you saw somebody shoot, but you don't know who they were?" Armstrong responded, "I never saw a gun. The only thing I saw was the shots, well, when the fire come out of it just fired and I ducked and ran."

Armstrong testified Antwon, Solomon, Tyreese, and Brown returned to Milwaukee sometime after the shooting. Armstrong noted that, while he was incarcerated, Devonne and J. went to Milwaukee to stay with Armstrong's brother and Armstrong spoke to Devonne and J. on the telephone.

### b.  Uncalled Defense Witnesses

On January 20, 2009, the district court held Armstrong's habeas corpus hearing, and two of Armstrong's out-of-state witnesses testified.[7] Solomon, Armstrong's biological brother, was the first witness. Solomon testified his foster brother, Antwon, wanted to go to Hayti Heights, Missouri, to visit family, so Solomon, Armstrong, Antwon, Tyreese, and Brown traveled together. Solomon claimed he did not see anyone in the car with a firearm. Solomon stated they went to 108 North Martin Luther King Drive, which Solomon believed was the home of Diane Davis. That night, the group decided to go to C.J.'s nightclub, and while they were at the nightclub, a fight broke out between Diane and Terrell. Solomon walked over to the fight with Antwon, but Armstrong remained seated at the table. Solomon stated the bouncer had a firearm and asked Solomon's party to leave. Solomon reported he heard Rosie encourage Carlos and Terrell to fight.

Solomon went outside and Antwon, Tyreese, and the McGees followed. Armstrong was still inside the bar getting his jacket. Solomon walked over to his car and tried to get the car out of the mud. Solomon claims it was so dark outside he

---

[7]Armstrong briefly testified on his own behalf, but we do not believe it is necessary to recount his testimony here.

-13-

could only see approximately five feet in front of him. When Solomon could not get his car out of the mud, he went back and forth from his brothers to his car a couple of times, trying to get them to help him. Solomon was walking back to his car when he heard the gunshots. Solomon testified the gunshots came from the area of the parking lot where "the McGees and my family was actually standing." Solomon could not see the people because it was too dark.

Solomon then stated, "[W]hen I the heard the gunshots, I immediately kind of took cover behind my car to see what was going on, and that's when pretty much everybody just scattered." Solomon heard between five and twelve shots, and never saw anyone with a gun, but he did see the gun flash. Again, Solomon testified the flash came from near the front entrance of the bar "where the McGees and also my family were standing." Solomon does not recall Armstrong in that area. Solomon maintains Armstrong and the three other men joined Solomon at his car and tried to push the car out of the mud, when someone started shooting at them. When the men could not get the car extracted, the group ran to North Martin Luther King Drive, past the men who were shooting at them. Solomon stated they went to either Channelle's or Diane's house. While they were at the residence on North Martin Luther King Drive, someone shot at the house. The men turned off the lights and hid in a hallway where there was no phone to call for help. Solomon testified there was a series of three drive-by shootings, and during the last drive-by shooting, Officer Hayes was shot. Solomon, Armstrong, Tyreese, and Antwon were arrested. Solomon said, the next morning everyone but Armstrong was released, and Solomon and the others eventually returned to Milwaukee.

Solomon explained, before Armstrong's trial, Armstrong's defense attorney called Solomon and asked him to testify on Armstrong's behalf. Solomon told Armstrong's counsel he had no money or method of transportation, and counsel told him to borrow the money and she would reimburse him. Solomon said he would have attended Armstrong's trial if he had the means.

-14-

During cross examination, Solomon again stated Armstrong did not know about the fight between Diane and Terrell, and Armstrong was still inside the bar when Solomon and the others walked outside, followed by the McGees. Solomon claimed he was in his car trying to get it out of the mud when the shots were fired. The prosecutor asked, "So you were in the car, working it back and forth or whatever, at the time you heard the shots?" Solomon replied, "Yes." Solomon again indicated the shots were coming from the front entrance of the bar. The prosecutor clarified that Armstrong had been inside the bar and later exited the front entrance of the bar, which is where the shots came from. Solomon stated he saw a flash from the area near the front entrance of the bar, but he did not identify who fired the gun. Solomon then took cover either behind or on the side of his car when the shots were fired. Solomon asserted he continued to take cover until Armstrong pulled him and they started to run. Solomon did not see Armstrong until after the shots were fired and Armstrong ran to the car. Solomon again testified he never saw the shooter.

Armstrong's foster brother, Antwon, also testified at Armstrong's habeas corpus hearing. At the time of the hearing, Antwon was incarcerated for a 1999 controlled substance conviction. Antwon testified he was sentenced to serve over sixteen years imprisonment. Antwon explained he did not have any convictions at the time of Armstrong's trial. Antwon reported that on January 6, 1996, Antwon, Armstrong, Solomon, Tyreese, and Brown drove to his cousin Diane's home in Hayti Heights, Missouri. Antwon testified various people came over to Diane's home that day, including Diane's boyfriend Terrell, whom Antwon knew from previous visits and considered to be a friend. Antwon testified he left for C.J.'s nightclub with Armstrong, Solomon, Tyreese, and Brown. Antwon stated Diane and Terrell met them at the club later. After a time in the nightclub, Antwon saw a commotion in the front of the club, and when he asked what was going on, Terrell got defensive. Tyreese said Terrell slapped Diane, so Antwon confronted Terrell. Antwon told Terrell they should take it outside, so Antwon walked out and Terrell and his family followed.

Antwon testified he was under the influence of alcohol to the point "it made [him] do things that [he] normally wouldn't do in character," for example, he felt more aggressive. Antwon was ready to fight and the crowd gathered around him. Brown notified Antwon's friends and family in the bar that Antwon was going to get jumped, so his brothers, including Armstrong, came outside to stand by him. Antwon said he never saw a gun inside the bar, and outside the bar it was "real dark." Antwon testified Rosie was encouraging Carlos and Terrell to fight, while Solomon, Armstrong, Tyreese, and Brown were next to Antwon trying to calm him down. Armstrong told Antwon to let it go and said, "They got guns, man." Antwon testified he did not see anyone with a firearm. Armstrong tried to grab Antwon, but Antwon resisted, and that is when Antwon heard the gunshots.

Antwon stated he and his group were standing facing the bar, while the McGees were standing facing the road. Antwon asserted he turned around and saw fire from gunshots as the shots were fired from the street toward the direction of the club. Antwon testified he ran to their car, which was stuck in the mud, and put the car in reverse, but the wheels were just spinning. Antwon said Solomon was in the car with him, while Armstrong, Tyreese, and Brown were outside of the car. When the men could not get the car out, they jumped out of the car and began to run toward the road. Antwon stated they ran inside Channelle's house. Antwon claimed he called his aunt and told her someone was shooting at them. The police arrived and ordered Antwon and his three brothers to lie on the floor. While they were being arrested, an officer was shot and fell on top of them. Antwon described how someone walked into the house where they were lying, pointed at them, and said they were the men at the nightclub that night. Armstrong, Solomon, Antwon, and Tyreese were then arrested.

Antwon also testified that before Armstrong's trial, Antwon was contacted by an investigator for Armstrong's attorney. Antwon does not recall whether the investigator asked Antwon to testify at Armstrong's trial. Antwon stated, if he had been asked to testify, he would have, but only "[i]f they would have made the

arrangements to get [him] there and protect [him]," because he was afraid for his life. During cross-examination, Antwon denied telling an investigator from the attorney general's office that the shots came from directly behind him and to the right.

After Antwon testified, the state called Thomas, an investigator with the Public Safety Unit of the Missouri Attorney General's Office. Thomas conducted an interview of Antwon on January 6, 2009, at the Federal Correctional Center where Antwon was housed. Thomas asked Antwon about the shooting, and Antwon said he was outside the club at the time of the shooting. Antwon stated Armstrong was standing behind and to the right of Antwon. When Thomas asked Antwon where the shots came from, Antwon explained, "[T]he shots came from right here," and gestured behind him and to the right. Antwon insisted Armstrong was not the shooter and said, "I know for a fact he wasn't the shooter and that he did not have a gun with him." Thomas asked Antwon if he would have returned to Missouri if Antwon had been subpoenaed. Antwon replied he would not have returned because he was afraid of getting shot.

### 3.    Credibility of All Witnesses

We must also consider the credibility of the uncalled witnesses to determine whether Armstrong was prejudiced by his counsel's ineffective assistance. <u>See</u> <u>McCauley-Bey</u>, 97 F.3d at 1106. Armstrong's two uncalled witnesses are both subject to impeachment. Antwon and Solomon have close personal relationships with Armstrong—Antwon is Armstrong's long-time foster-brother, and Solomon is Armstrong's biological brother. This relationship creates a potential bias and a motive to provide false information, which could lead to the release of Antwon's and Solomon's brother from prison. <u>See</u> <u>Williams v. United States</u>, 452 F.3d 1009, 1013 (8th Cir. 2006) (noting the extent of the witness's personal relationship with the defendant should be considered in evaluating the credibility of the witness). Neither Antwon nor Solomon came forward to testify at Armstrong's trial, despite receiving telephone calls from Armstrong's counsel or her investigator providing them with

information about the trial and offering to reimburse them for their travel. See McCauley-Bey, 97 F.3d at 1106 (recognizing the witness's failure to come forward promptly may impact the credibility of the witness).

At the time of the habeas hearing, Antwon was serving a 200-month prison sentence for a 1999 drug conviction, which he received three years after Armstrong's trial. Antwon could not have been impeached for this offense at the time of Armstrong's trial, and we have already held Armstrong's attorney should have secured Antwon's attendance at the time of Armstrong's initial trial. However, we must also weigh the credibility of the testimony Antwon provided at the habeas hearing, and Antwon's felony conviction certainly weakens his credibility. See Fed. R. Evid. 609(a)(1), (b).

In addition to Antwon's and Solomon's close relationship with Armstrong, and Antwon's criminal history, the credibility of Armstrong's uncalled witnesses must also be questioned on the basis of their inconsistent testimony. Solomon twice changed his testimony when referencing where he was at the time of the shooting. Solomon initially claimed he was walking toward his car and then took cover by his car when the shots were fired. Solomon next asserted he was inside his car, trying to get it out of the mud when the shooting started. Finally, Solomon claimed he was standing beside his car, taking cover when the shots were fired. Despite Solomon's poor memory of his location at the time the shooting began, he testified the shooting came from near the front entrance of C.J.'s nightclub, he could only see approximately five feet in the dark, he did not see who was responsible for the shooting, and he did not see Armstrong until after the shooting began and Armstrong met Solomon at the car. Even if Solomon's testimony were believed, Solomon's testimony that he did not see Armstrong at the time of the shooting, or who did the shooting, is not particularly beneficial to Armstrong's defense.

-18-

Antwon also provided inconsistent testimony at the habeas hearing. Most significantly, Antwon claimed the shots were fired from the road, whereas the other eyewitnesses who identified the location of the shooting, including Solomon, testified the shooting took place near the front entrance of C.J.'s nightclub. Additionally, both Antwon and Solomon placed themselves inside the vehicle after the shooting, trying to work the car out of the mud. Antwon was also the only witness to testify there was access to a telephone at Channelle's house after the shootings, and instead of contacting the police, Antwon called his aunt. Antwon insists Armstrong did not have a gun in C.J.'s parking lot, but like Solomon, Antwon did not see who was responsible for the shootings. This testimony is contradicted by the government's nine eyewitnesses[8] who testified they saw Armstrong shoot Carlos, Devonne, and Yolanda.[9] See McCauley-Bey, 97 F.3d at 1106 (discounting the credibility of an uncalled witness whose testimony was inconsistent with the testimony of the other witnesses).

Armstrong attempts to challenge the credibility of the government witnesses, claiming the relationship of the victims and the witnesses creates a motive to fabricate. This relationship did not exist with the employees of C.J.'s nightclub, including the doorman who testified he saw Armstrong display a gun, as Armstrong stood beside the doorman inside the club. C.J's owner testified Armstrong acted as if he had a gun.

We are unconvinced any of the Davises had a recognizable motive to falsely accuse Armstrong of murder. The Davises are each biologically related to Antwon and Tyreese, and Armstrong considers Antwon and Tyreese brothers. Armstrong

_____

[8]Levonne, Yolanda, Michael, Diane, Felicia, Devonne, Channelle, Terrell, and Rosie.

[9]J. also saw Armstrong begin to fire his weapon, but J. ducked and did not see Armstrong actually shoot Carlos. When J. got up, he saw that his sister, Devonne, had been shot.

knew Devonne and Levonne from their visits to Milwaukee, and Armstrong met the other Davises, those who testified at trial, at Channelle's house that day. When Diane and Terrell began to argue, some of the Hamiltons and the Armstrongs came to Diane's defense, putting them on the same side of the argument as the Davises. After the shooting was over, Devonne, who had been shot in the thigh, went to the car Armstrong had driven to the bar and asked for a ride. When Solomon, Antwon, and Tyreese returned to Milwaukee, J. and Devonne followed and stayed with them. Armstrong reported he continued talking to Devonne and J. while he was incarcerated. The relationship Armstrong had with the Davises does not support Armstrong's claim the Davises had a motive to fabricate information about his guilt.

Armstrong charges the McGees were biased because they were seeking vindication for Carlos's death. Armstrong puts forth a theory that Carlos was hit by friendly fire and the McGees wanted to pin the death on Armstrong. The remarkable consistency of the McGees's statements with the testimony of the unrelated witnesses lends credibility to the McGees's testimony. We must consider, of course, that the McGees were involved in an altercation with the Armstrongs and the Hamiltons, and would have a bias against Armstrong for that reason.

### 4. Analysis

On remand for the second time, the district court found Antwon and Solomon were credible witnesses because (1) neither had given a prior statement that could be used to impeach them, (2) neither had a criminal conviction at the time of trial, and (3) "while small details may have varied between the accounts the two men gave more than thirteen years after the fact, they were unequivocal in their assertions that [Armstrong] never possessed a firearm." In considering the interplay of the uncalled witnesses with the actual defense witnesses called, the district court concluded Solomon's and Antwon's testimony would not have been cumulative, and they "could have provided a defense for [Armstrong] had they been called to testify." Finally, the district court considered the strength of the prosecution's case and noted "there was

some confusion regarding both the ballistic reports from the shootings of [Carlos] and [Officer Hayes], and the chains of custody of the bullets from the shootings." The district court also emphasized that the close relationship of Antwon and Solomon with Armstrong "is neutralized by the fact that all the State's witnesses had personal relationships with the victims and/or with each other."

The district court did not give proper weight to the credibility of the uncalled witnesses, the interplay between the uncalled witnesses and the actual defense witnesses called, and the strength of the evidence presented by the prosecution. See McCauley-Bey, 97 F.3d at 1106-07. Taking into consideration each of the McCauley-Bey factors, we conclude Armstrong failed to demonstrate a reasonable probability the outcome of his trial would have been different had it not been for defense counsel's ineffectiveness.

First, Armstrong's uncalled witnesses offered inconsistent testimony, in part, and were patently impeachable. In contrast, the government's witnesses were largely consistent with one another, and several had no rational basis for prevarication. The district court erred in finding Armstrong's relationship with Antwon and Solomon was "neutralized" by the relationships many of the state's witnesses had with the victims. There is no evidence in the record to support the view that the staff at C.J.'s nightclub or the Davises had any bias or motive to testify falsely. The district court's citation that neither Antwon nor Solomon had given a prior statement does not bolster their credibility. In fact, their failure to come forward for so many years has the opposite effect. And, while it is true neither witness had a conviction at the time of trial, Antwon did have a felony conviction at the time of the habeas hearing, which should be considered when measuring his hearing credibility. It is also necessary to consider the inconsistencies in Solomon's and Antwon's testimony. Antwon's testimony the gunfire came from the direction of a nearby road is contrary to each of the government's witnesses, as well as Armstrong's and Solomon's.

-21-

Second, while Antwon and Solomon are the only witnesses who have attempted to corroborate Armstrong's claim that Armstrong was unarmed at the time of the shootings, neither of the uncalled witnesses testified to seeing someone other than Armstrong fire the shots which killed Carlos, and injured Devonne and Yolanda. Solomon's testimony described the darkness and actually placed Armstrong in the area where the shots were fired at the time the shots were fired.

Finally, "there is no prejudice if, factoring in the uncalled witnesses, the government's case remains overwhelming." Id. at 1106 (citations omitted). At Armstrong's trial, the strength of the evidence presented by the prosecution was overwhelming. Of the government's nineteen witnesses, ten of the witnesses[10] testified they saw Armstrong with a gun in C.J.'s parking lot. The same ten witnesses saw Armstrong shooting the gun. Although J. was ducking and did not see Armstrong's target, the remaining nine witnesses testified they saw Armstrong shooting at Carlos. The district court accurately observed there is no physical evidence connecting Armstrong to the shooting.[11] However, the testimonial evidence

[10]Levonne, Yolanda, Michael, J., Felicia, Devonne, Channelle, Diane, Terrell, and Rosie.

[11]The district court indicated there was confusion regarding the ballistics reports from the shootings of Carlos McGee and Officer Hayes. During Armstrong's trial, Wagoner, a firearms and toolmarks examiner, was the only person to testify on this issue. Wagoner concluded the two bullets could not have been fired from the same gun. No evidence was presented to contradict this testimony.

The district court also took issue with the chains of custody of the bullets collected after the shootings. During Armstrong's trial, the prosecution and defense stipulated to the chains of custody of the bullets removed from Carlos and Officer Hayes. The prosecutor and defense counsel also stipulated there was an incorrect date on the chain of custody for some of the shell casings and clarified the appropriate date for the jury. Defense counsel declared, "we're not objecting to the chain of custody and [its] correct date." In light of this stipulation and clarification, no issue regarding the chain of custody for the bullets remained.

against Armstrong convinces us there is no reasonable probability the outcome of Armstrong's trial would have been different had Armstrong's uncalled witnesses testified. See Strickland, 466 U.S. at 694. For these reasons, we conclude the district court erred in finding prejudice and granting Armstrong's application for a writ of habeas corpus.

## C.    Procedural Default

The district court, in its initial order, concluded the claims in Armstrong's habeas application were procedurally defaulted when Armstrong filed his state motion for post-conviction relief five days after the deadline. The district court found cause for Armstrong's procedural default because a state-employed prison librarian gave Armstrong the wrong deadline for filing the motion. The district court then decided Armstrong's ineffective assistance of counsel claim was meritless, and as a result, Armstrong failed to demonstrate sufficient prejudice to excuse the default.

"A claim is procedurally defaulted if a habeas petitioner failed to raise it in state proceedings." Wooten v. Norris, 578 F.3d 767, 777 (8th Cir. 2009) (citation omitted). "A showing of cause and prejudice may serve to excuse a procedural default and open the door to federal review of an applicant's otherwise defaulted claim." Id. (citation omitted).[12] To demonstrate procedural bar prejudice, Armstrong "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). Our court has "observed that [procedural bar] 'prejudice' is higher than that required to establish ineffective

---

Finally, the district court noted no firearm was introduced at trial. This absence of the actual weapon is neither unusual nor particularly significant in this case.

[12]We need not determine whether the district court properly held Armstrong demonstrated sufficient cause to excuse his default, because we decide this issue based upon the prejudice inquiry.

assistance of counsel under <u>Strickland</u>." <u>Charron v. Gammon</u>, 69 F.3d 851, 858 (8th Cir. 1995) (citing <u>Zinzer v. Iowa</u>, 60 F.3d 1296, 1299 n.7 (8th Cir. 1995)). <u>But</u> <u>see</u> <u>Clemons v. Luebbers</u>, 381 F.3d 744, 752-53 n.5 (8th Cir. 2004) (noting the standards for prejudice under the <u>Strickland</u> analysis may be similar to the standards for prejudice under the procedural default analysis).

Armstrong has not demonstrated sufficient prejudice under <u>Strickland</u>. It necessarily follows that Armstrong has not shown defense counsel's failure to procure the testimony of Antwon and Solomon "worked to [Armstrong's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>Frady</u>, 456 U.S. at 170. We likewise conclude Armstrong has failed to establish sufficient prejudice to overcome his procedural default. <u>See</u> <u>id.</u>

## III.  CONCLUSION

We reverse the judgment of the district court and deny, with prejudice, Armstrong's § 2254 application.

_____