# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3104

_____

Dimetrious L. Woods

*Petitioner - Appellant*

v.

Jeff Norman

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 13, 2016
Filed: June 6, 2016

_____

Before LOKEN, GRUENDER, and KELLY, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Appellant Dimetrious Woods was convicted of second-degree drug trafficking following a bench trial in Missouri state court. The Missouri Court of Appeals affirmed the conviction on direct review and subsequently affirmed the denial of his

motion for post-conviction relief. Woods petitioned for a writ of habeas corpus under 28 U.S.C. § 2254. The district court[1] denied his petition. We affirm.

I.

On May 19, 2006, shortly before 8:30 p.m., Woods and Raymond Brown were traveling eastbound on Interstate 70 in a car that contained over 9,000 grams of powdered cocaine. The highway patrol had set up a "ruse checkpoint," which involved posting signs indicating that a drug checkpoint was ahead in order to induce drug carriers to exit the highway to bypass the checkpoint. Woods and Brown exited the highway after passing these signs. Officer Bret Brooks saw the vehicle exit the interstate, cross the overpass, and return to the interstate traveling in the opposite direction.

Concerned that Woods and Brown were attempting to avoid the ruse checkpoint, Officer Brooks followed the vehicle down the interstate. Officer Brooks activated his emergency lights after he observed the vehicle exceed the posted speed limit and change lanes without signaling. The vehicle exited the interstate and pulled into a truck stop. Before the car came to a complete stop, the doors opened and both Brown and Woods exited the vehicle, Brown from the driver side and Woods from the passenger side. Both men began walking quickly toward the truck stop's convenience store. Officer Brooks stopped behind the vehicle with the lights of his patrol car flashing. He exited the patrol car and called out to Woods and Brown, telling them to stop. Neither Woods nor Brown complied. After Officer Brooks yelled a second time, Woods turned around and began walking toward Officer Brooks. Brown did not stop walking away until Officer Brooks yelled a third time.

_____

[1] The Honorable David Gregory Kays, Chief Judge, United States District Court for the Western District of Missouri.

-2-

Officer Brooks then directed Woods back to the car and took Brown a short distance away. Officer Brooks informed Brown of the traffic violations he had committed and asked for his driver's license. Brown was breathing heavily, his hands were shaking, and he had some difficulty removing his license from his pants. Brown consented to a search of his person, during which Officer Brooks found two large bundles of hundred-dollar bills. Officer Brooks then moved Brown to the patrol car. Brown informed Officer Brooks that he previously had been convicted of a drug offense and was on parole. When Officer Brooks asked Brown if he could search the vehicle, Brown responded that he could not consent to a search because Woods had rented the car. Officer Brooks also asked Brown if there was anything illegal in the vehicle, but Brown did not respond.

Officer Brooks then approached Woods, who was seated in the passenger seat of the car. Woods provided Officer Brooks with his driver's license, which indicated that he lived in Columbia, Missouri. Woods also explained that he had rented the vehicle in St. Louis. While speaking with Woods, Officer Brooks observed that Woods had two cell phones, one of which was ringing repeatedly. Officer Brooks also observed that Woods's hands were shaking and that he was breathing heavily. When Officer Brooks asked Woods for permission to search the vehicle, Woods responded, "Well, normally I call my lawyer first, but in this case, no." Officer Brooks then asked Woods if he ever had been arrested before, and Woods responded that he had served five years in prison for drug trafficking.

Either before or after he spoke with Woods, Officer Brooks called a canine officer and requested that he come to the truck stop. When this officer arrived, he ran his dog around Woods's rental vehicle, and the dog indicated that there was an illegal substance inside the car. The canine officer opened the trunk and found what appeared to be bundles of drugs.

At that point, Officer Brooks placed both Woods and Brown under arrest. Officer Brooks searched the two men and found that Brown had in his possession more than $4,000 and that Woods had more than $2,000. Brooks then handcuffed both men and put them in the back of his patrol car. At that point, Brooks also activated a tape recorder inside the patrol car in order to record any conversation that took place between Woods and Brown. Brooks did not inform the men that he was recording their conversation.

After Officer Brooks left the patrol car to conduct a full search of Woods's vehicle, Brown informed Woods that he would "take everything," a statement to which Woods replied, "[r]eally?" Woods also explained to Brown the nature of ruse checkpoints, and Brown responded that Woods "should've told him that" so he would not have exited the highway.

Officer Brooks conducted two field tests of the substance inside the bundles found in the back of the car, and both tests indicated positive for cocaine. In addition to the bundles in the trunk, Officer Brooks's search of the vehicle revealed several more cell phones, a radar detector, an air deodorizer, and paperwork addressed to Woods at a St. Louis address.

Both Woods and Brown were charged with drug trafficking. The two men were to be tried jointly, but Brown accepted a plea deal on the morning of trial. During Woods's bench trial, the state presented the testimony of Officer Brooks and the canine officer regarding the events leading up to the discovery of the cocaine. One of the courtroom bailiffs also testified, explaining that during a break the previous day Woods had referred to Brown as his "partner" and explained to the bailiff that if Brown pleaded guilty "he can ruin everything for me."

Woods testified in his own defense. According to his testimony, Woods had been traveling to Kansas City from Columbia to meet with Harold Mitchell, who worked at a body shop and was painting Woods's car. Woods further testified that he had been using a rental car because neither of his vehicles was available, and he had rented the car from an Alamo location in St. Louis because they offered a good rate. Woods stated that he had rented cars from this location many times in the year preceding his arrest. Woods also explained that on the day of his arrest he had agreed to give Brown, whom he had known for fifteen years, a ride to Kansas City, but he had no knowledge of Brown's true purpose in traveling there. Woods testified that he and Mitchell discussed Woods's car for a lengthy period, and that during part of that time Brown left the body shop to get something to eat. Mitchell also testified, confirming that Woods and another man had visited his shop in Kansas City for about an hour on the day in question. Woods's counsel subpoenaed Brown, and Brown was present at Woods's trial. On the final day of trial, however, Woods's counsel explained that he had consulted with Woods and that they had decided not to call Brown as a witness.

Woods was convicted of drug trafficking in the second degree and sentenced to twenty-five years' imprisonment. After the Missouri Court of Appeals rejected Woods's direct appeal, Woods sought post-conviction relief in state court. The same judge who had presided over Woods's bench trial heard his state habeas claim. At the evidentiary hearing on this claim, Woods argued that his trial counsel had been constitutionally ineffective because the lawyer failed to interview or present the testimony of Brown. According to Woods, Brown had been willing to testify that the drugs belonged to him and that Woods had no knowledge of their presence in the rental car. The post-conviction court held a hearing on this claim, at which Woods testified and presented the testimony of his trial counsel and Brown. Brown provided his account of the day he and Woods were arrested. He also informed the court that his testimony at Woods's trial would have consisted of him taking full responsibility

for the crime and testifying that Woods had no involvement in or knowledge of the transportation of the drugs found in the car. After hearing this testimony, the court determined that Woods's counsel had not been ineffective in declining to call Brown as a witness. The court further explained that even if the record supported Woods's contention that his counsel should have called Brown, the overwhelming evidence of Woods's guilt would have caused the court to disregard Brown's testimony.

The Missouri Court of Appeals affirmed the decision of the post-conviction court, and Woods petitioned for a federal writ of habeas corpus, raising four claims. The district court denied Woods's petition and denied Woods a certificate of appealability with respect to all four of his claims. We subsequently granted a certificate of appealability only as to whether Woods's trial counsel's failure to call Brown as a witness entitled Woods to habeas relief. Woods now appeals the district court's decision on that question.

II.

In an appeal from the denial of a habeas petition, we review the district court's conclusions of law *de novo* and its findings of fact for clear error. *Williams v. Norris*, 612 F.3d 941, 946 (8th Cir. 2010). Because Woods's claim was "adjudicated on the merits in State court proceedings," our review of his petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* 28 U.S.C. § 2254(d). Under this statute, a federal court may not overturn the state court's decision on a federal claim unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or the decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. *Colvin v. Taylor*, 324 F.3d 583, 586-87 (8th Cir. 2003) (citing 28 U.S.C. § 2254(d)).

The federal law at issue in this appeal is the Sixth Amendment's assurance that criminal defendants will receive the effective assistance of counsel. In order for a defendant to establish that his attorney's assistance was so ineffective that it deprived him of his constitutional right to counsel, he must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense by creating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Because an assessment of the performance of Woods's trial counsel is unnecessary to our decision, we focus exclusively on the Missouri Court of Appeals's determination that the failure of Woods's counsel to call Brown as a witness did not prejudice Woods's defense. *See Williams v. Roper*, 695 F.3d 825, 830 (8th Cir. 2012) (assuming without deciding that a state court's performance determination was unreasonable where analysis of *Strickland*'s prejudice prong was sufficient to deny habeas relief).

Woods first argues that the district court erred by finding that the court of appeals's prejudice determination was not contrary to federal law. "For a state court decision to be 'contrary to' federal law, the decision must be 'substantially different from the relevant precedent of [the Supreme] Court.'" *Huss v. Graves*, 252 F.3d 952, 955 (8th Cir. 2001) (alternation in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). Woods contends that the Missouri Court of Appeals contravened federal law when it stated that even if Woods's counsel had called Brown, "the outcome of the proceeding would not have changed." According to Woods, the omission from this statement of *Strickland*'s "reasonable probability" language shows that the court applied a more rigorous "sufficiency of the evidence test" when making its prejudice determination.

We agree with the district court that this alleged imprecision in the Missouri Court of Appeals's opinion fails to demonstrate that its decision was contrary to

-7-

*Strickland*'s prejudice standard. As the district court recognized, the state court correctly articulated the reasonable probability standard earlier in the paragraph cited by Woods, explaining that "Woods must show that, but for counsel's errors, there is a reasonable probability that the outcome of the court proceeding would have been different." Again quoting *Strickland*, the court further explained that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Given its accurate statement of the law, the court's subsequent failure to repeat *Strickland*'s "reasonable probability" language does not show that its decision was contrary to that standard. *See Woodford v. Viscotti*, 537 U.S. 19, 22 (2002) (holding that a state court's use of the term "probable" without the modifier "reasonable" when explaining the *Strickland* prejudice standard "can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision").

Woods also argues that the Missouri Court of Appeals contravened *Strickland* by basing its prejudice determination on "the subjective views of the trial judge in this court-tried case." Nothing in the record, however, supports this assertion. The court's opinion summarized the reasoning of the post-conviction court, which in turn correctly noted that prejudice required "a reasonable probability of a different result from a reasonable fact-finder (not from the actual fact-finder)." Furthermore, the court of appeals's opinion itself contains no indication that the court applied a subjective, rather than an objective, prejudice standard. After explaining the *Strickland* test, the court concluded that "Woods ha[d] failed to prove prejudice" based on "[t]he record" before it. Nothing in this statement implies that the court based its prejudice determination "on the idiosyncracies of the particular decisionmaker." *See Strickland*, 466 U.S. at 695; *cf. Saranchak v. Beard*, 616 F.3d 292, 309 (3d Cir. 2010) (finding that the state court had contravened *Strickland* by "considering the effect the new evidence would have had on [a] particular judge").

Woods next argues that, contrary to the district court's ruling, the state court's application of the *Strickland* prejudice test was unreasonable. "A decision is 'an unreasonable application' of federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013) (alternation in original) (quoting *Williams*, 529 U.S. at 413). In making this determination, "the proper question is whether there is 'any reasonable argument' that the state court's judgment is consistent with *Strickland*." *Williams*, 695 F.3d at 831-32. This inquiry requires that "we examine the ultimate legal conclusion reached by the court, not merely the statement of reasons explaining the state court's decision." *Id.* at 831 (internal citation omitted).

When applying the prejudice prong of the *Strickland* analysis to a defense lawyer's decision not to call a witness, we assess "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." *McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996). The Missouri Court of Appeals did not explicitly proceed through these steps when it determined that Woods had suffered no prejudice as a result of his counsel's performance. Our review of the record, however, shows that the legal conclusion the court reached was not unreasonable. *See Williams*, 695 F.3d at 831-32.

First, several factors would have undermined the credibility of Brown's testimony. Brown and Woods had known each other for fifteen years, which "creates a potential bias and a motive to provide false information." *See Armstrong v. Kemna*, 590 F.3d 592, 603 (8th Cir. 2010) (finding that defendant's long relationship with his brother and foster brother undermined the credibility of their exculpatory testimony). And because Brown already had pleaded guilty to the drug trafficking offense, he had

-9-

little to lose by taking full responsibility for the drugs found in the car. *See, e.g.*, *United States v. Rodriguez-Marrero*, 390 F.3d 1, 15 (1st Cir. 2004) ("We have previously characterized post-sentencing exculpatory testimony of co-conspirators as being 'inherently suspect.' Such witnesses have little to lose by fabricating stories designed to free their comrades . . . ." (quoting *United States v. Montilla-Rivera*, 171 F.3d 37, 42 (1st Cir. 1999))); *United States v. Simmons*, 714 F.2d 29, 31-32 (5th Cir. 1983) ("[O]nce sentence has been imposed on a co-defendant, ' . . . there is very little to deter the . . . co-defendant from untruthfully swearing out an affidavit in which he purports to shoulder the entire blame.'" (quoting *United States v. La Duca*, 447 F.Supp. 779, 783 (D.N.J. 1978))). Moreover, under Missouri law the prosecution could have impeached Brown with this guilty plea as well as a previous guilty plea for possession of cocaine base. *See* Mo. Rev. Stat. § 491.050.

Second, although Brown may have echoed Woods's testimony that Woods had no knowledge of the drugs, Brown provided no additional details to corroborate this assertion. To the contrary, the combined testimony of the defense witnesses would have left several questions unanswered. For example, Brown testified in the pre-trial suppression hearing that the he and Woods were in Kansas City for only ten or fifteen minutes, whereas both Woods and Mitchell indicated that Woods was at Mitchell's shop for a significantly longer period. Furthermore, neither Woods nor Brown explained the coincidence of Woods's trip to Kansas City occurring the same day as Brown's drug transaction, which Brown stated he had arranged before learning about Woods's planned trip. Nor did Brown provide Woods with any alternative explanation for why he decided to accompany Woods to Kansas City. Furthermore, the record undermines both Woods's testimony and Brown's potential testimony that Woods was unaware of the cocaine in the trunk until after the two had been arrested. For example, while the two men were talking in the back of the patrol car, a recording device recorded Brown telling Woods that Woods should have warned him about the ruse checkpoint, demonstrating that Woods had known about the drugs at the time the

-10-

men encountered the checkpoint. During the same conversation, Woods expressed surprise, saying "really?", when Brown stated that he would "take everything," and he did not ask Brown any questions about what the trunk of their car contained or what "tak[ing] everything" entailed. This response indicates that Woods knew about the cocaine before the police discovered it and was surprised that Brown was willing to take full responsibility for drugs they both had been transporting.

Finally, Brown's testimony would not have accounted for the additional evidence of Woods's guilt. For example, Woods had rented the car in which the cocaine was found, and he had rented it from a location in St. Louis despite the fact that he lived in Columbia and planned to travel to Kansas City. In addition, Woods had rented a car in St. Louis on numerous prior occasions despite the fact that he owned two cars. After Officer Brooks pursued Woods's vehicle to the truck stop, Woods quickly exited the car and began walking away from it at a fast pace, initially ignoring the police car's flashing lights and Officer Brooks's calls to stop. *See, e.g.*, *State v. Moore*, 729 S.W.2d 239, 240 (Mo. Ct. App. 1987) ("Defendant's flight at the scene . . . is indicative of guilt."). When Officer Brooks confronted Woods, Woods's hands were shaking, and he was breathing heavily. Officer Brooks's subsequent search of Woods and the vehicle revealed that Woods had in his possession a radar detector, two cell phones, and more than $2,000 in cash—evidence indicating Woods's involvement in transporting the cocaine. *See, e.g.*, *State v. Jackson*, 304 S.W.3d 791, 795 (Mo. Ct. App. 2010) (finding that money found on defendant's person provided evidence he was engaged in drug-trafficking enterprise); *see also* *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (recognizing that the use of multiple cell phones was evidence that defendant was engaged in a drug-distribution conspiracy). Moreover, a bailiff testified at Woods's trial that during a

break in the court proceedings Woods had referred to Brown as his "partner" and explained to the bailiff that if Brown pleaded guilty "he can ruin everything for me."[2]

Based on this evidence, as well as the factors undermining the credibility of Brown's proposed testimony, we agree with the district court that the Missouri Court of Appeals reasonably could have concluded that there was no reasonable probability that trial counsel's failure to call Brown as a witness affected the outcome of Woods's trial. *See Williams*, 695 F.3d at 832.

### III.

For the reasons set forth above, we affirm the district court's denial of a petition for a writ of habeas corpus.

_____

[2] Woods argues that the court's characterization of this largely circumstantial evidence as "overwhelming" constitutes an erroneous factual finding entitling him to *de novo* review of his *Strickland* claim under 28 U.S.C. § 2254(d)(2). Setting aside the question whether such a characterization represents a factual determination, we reject Woods's argument because the court's decision was not "based on" any such assessment, as required by 28 U.S.C. § 2254(d)(2). Rather, the court based its decision on whether, given the evidence in the record, Brown's testimony would have presented a reasonable probability of a different result.